FILED
98 MAR 24 PM 12:38
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DENNIS C. MURPHY, | } | |
| Plaintiff, | } | |
| v. | } | CASE NO. CV-96-B-0919-S |
| BROWN PAPER CONVERTING MACHINE WORKS, INC., | } | |
| Defendant. | } | |

ENTERED
MAR 2 4 1998

## MEMORANDUM OPINION

Currently before the Court is the Motion for Summary Judgment of defendant Brown Paper Converting Machine Works, Inc. ("BPC"). The present action arises out of claims by plaintiff Dennis Murphy ("Murphy") that his former employer, BPC, discriminated against him because of his status as a former drug user in violation of the Americans with Disabilities Act ("ADA").[1] Murphy also contends that BPC's conduct gives rise to claims of outrage and invasion of privacy under Alabama law. *See* Pl.'s Compl. ¶¶ 15-18. BPC argues that Murphy had suffered no adverse employment action because Murphy terminated his own employment. Def.'s Mot. ¶ 2. Alternatively, BPC contends that Murphy has failed to provide any evidence that his alleged discharge is related to his prior drug usage and that it had requested medical information to ensure that Murphy could safely perform his machinist

---

[1] Murphy originally claimed that he was also discriminated against in violation of the ADA because he suffered from migraines. Pl.'s Compl. ¶ 9. At the hearing on the present Motion, Murphy abandoned that claim, conceding through counsel that he was not subjected to unlawful discrimination because of his migraines, but solely because of his former drug use.

- 1 -

job, not to uncover drug use. *Id.* ¶¶ 1, 3. BPC likewise avers that it did not invade Murphy's privacy under Alabama law nor did it engage in any conduct which could be characterized as outrageous. *Id.* ¶¶ 4-6. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that BPC's Motion is due to be granted.

## I. FACTUAL SUMMARY

Defendant BPC is a machine shop located in Sylacauga, Alabama and employs approximately seventeen employees. Brown Dep. at 16. In May 1993, plaintiff Murphy applied for a machinist position with BPC. Murphy Dep. Ex. 2 at 1 (Murphy personnel file). On his own initiative, Murphy informed Billy Brown ("Brown")[2] during a pre-employment interview that Murphy had undergone drug rehabilitation for marijuana use in the early 1980s. Murphy Dep. at 132-34. Brown inquired as to the effectiveness of the rehabilitation and Murphy assured Brown that he "had been clean since then." *Id.* at 133-34. Following this interview, Brown checked one of Murphy's references who indicated that Murphy had had "drug problems." Brown Dep. at 20-21.

Brown subsequently offered Murphy employment with BPC and told Murphy that he would have to pass a drug screen in order to be hired. Murphy Dep. at 144-45. Brown informed Murphy that a pre-employment physical and drug screen was required of all employees. *Id.* at 145. On May 24, 1993, Murphy underwent a drug screen performed by

---

[2] BPC is owned by Billy Brown, his son Rocky Brown, and his daughter-in-law Sheila Brown. Brown Dep. 12. "Brown" will refer to Billy Brown. Other members of the Brown family will be referenced by either full names or first names.

Dr. Edvin J. Larson, who routinely performed drug tests for BPC.[3] *Id.* 145, 503-04; Larson Aff. ¶ 2. The results of Murphy's drug screen appeared to be negative for any controlled substances.[4] Murphy Dep. at 148-49; Larson Aff. ¶ 3, Attach. A. On June 1, 1993, Murphy began working as a machinist for BPC. Murphy Dep. Exs. 2, 3.

According to Murphy, in June 1994, he suffered a migraine while at work. Murphy Dep. at 188-89. He allegedly slipped while kneeling and leaning against his tool box but claims to have never fainted or fallen down. *Id.* at 189, 200. Murphy concedes that it may have appeared that he fainted if an observer had not witnessed the entire episode. *Id.* at 192. According to Brown, he was informed that Murphy had fallen and subsequently found Murphy sitting on the floor, leaning against his toolbox. Brown Dep. at 55. Lewis Mooney ("Mooney"), Murphy's supervisor, went to assist Murphy after hearing that Murphy was sitting down next to his lathe. Mooney Dep. at 39-40.

With Murphy's consent, Brown and a co-worker escorted Murphy to the office of Dr. R. Alan Sather, Murphy's personal physician. Murphy Dep. at 189, 200. During that office visit, Murphy claims to have heard Brown conversing with Dr. Sather in an angry voice but

---

[3] Murphy has moved the court to strike the supplemental evidentiary submissions filed by BPC with its Reply Brief, including Dr. Larson's affidavit. By separate order, Murphy's Motion to Strike is denied as BPC's additional submissions are clearly responsive to arguments set forth in Murphy's Brief in Opposition.

[4] BPC has presented a copy of the test results which indicate that Murphy actually tested positive for marijuana. Brown Aff. ¶¶ 4-8, Attach. A. Apparently, BPC relied on the cover sheet accompanying the results which erroneously reflects a negative finding. *Id.* There is conflicting testimony as to when this error was discovered. Murphy's testimony seems to indicate that BPC discovered the positive drug test near the end of his employment. *See* Murphy Dep. at 283. BPC contends that it did not discover this discrepancy until Murphy's personnel file was reviewed for purposes of responding to his EEOC charge. Brown Aff. ¶ 7.

admits he could not hear what was said. Murphy Dep. at 190, 201; Murphy Aff. ¶ 7. Murphy maintains that he had never before had blood drawn in relation to a migraine, but on this occasion a nurse allegedly drew a blood sample from Murphy. Murphy Dep. at 190. Murphy states that Dr. Sather told him not to worry about the blood sample and that he had thrown away the sample. *Id.* at 190-91.[5] Dr. Sather wrote a letter to Brown which explained Murphy's migraines, described Murphy's medication, and concluded with the following sentences: "In my opinion, this patient is drug-free, reliable fellow and should be a good employee for you. If there are any further questions, please do not hesitate to call or write me." Pl.'s Evidentiary Submission Ex. 5. At the behest of Brown, Murphy was also examined by Dr. Larson after returning to work at the end of June 1994 and received medicine for sinus infections. Murphy Aff. at ¶¶ 9-11.

Murphy agrees that, with the exception of the June 1994 migraine episode, he was treated by BPC and its employees in a courteous manner until November 1994. Murphy Dep. at 178-79, 187-88. He further states that BPC had been cooperative throughout his employment in accommodating his absences due to chronic migraines. *Id.* at 442-43, 494-96.

On or about December 27, 1994, Murphy began suffering medical problems due to kidney stones. *Id.* at 180. Consequently, Murphy missed work during the remainder of December 1994 and most of January 1995. *Id.* at 180-83. During that time, Murphy underwent a medical procedure to help him pass the kidney stones. *Id.*

---

[5] Dr. Sather denies that Brown or anyone else at BPC instructed him to perform a drug test on Murphy and further denies that he ever told Murphy that he had thrown away any blood samples. Sather Aff. at ¶¶ 4-6.

On January 30, 1995, Murphy returned to work and submitted a return-to-work release from Dr. Simon Mirelman, the urologist who had performed the kidney stone procedure. *Id.* at 185, 245-47. After working for two days, Murphy missed work during the next three days due to "after-effects" of the kidney stone removal procedure. *Id.* at 183-86, 231. He resumed work on February 6, 1995 and completed an eight-hour day but required assistance during that day due to back pain. *Id.* at 214, 217, 231-32. On February 7, 1995, Murphy went to work but returned home before his work shift began because of muscle spasms in his back. *Id.* at 216-17, 232-33. According to BPC personnel records, Murphy never worked again at BPC. *Id.* at Ex. 3 (Murphy attendance records).

On either February 6 or February 7, 1995, Mooney and Brown first discussed whether Murphy could perform his job. Mooney Dep. at 56. According to Mooney, Murphy's machinist job was dangerous work that required "close tolerance." *See id.* at 23, 25. Murphy acknowledges that a lack of on-the-job alertness could result in a loss of life or limb. Murphy Dep. at 395-96. He further agrees that his medical problems had been interfering with his ability to work. *Id.*

On the night of February 7, 1995, Brown contacted Murphy at home and recommended that Murphy "take a few days off until [he] got to feeling better." *Id.* at 220, 234. Murphy asserts that, because he had been medicated at the time of his conversation with Brown, he contacted Mooney the next morning to confirm what Brown had said. *Id.* at 234-35. Murphy maintains that he told Mooney that he would return to work the next week on February 13, 1995. *Id.* at 220, 235. On the night of February 12, 1995, Mooney called Murphy and told

him to take an additional week off work. *Id.* at 220-21, 234-35.

When he returned to work on February 20, 1995, Murphy did not have a time card. *Id.* at 221; Brown Dep. at 86. Murphy met with Mooney and Brown that same morning. Murphy Dep. at 255; Brown Dep. at 99. Brown claims that his reason for the meeting was to make sure Murphy could safely perform his work. Brown Dep. at 87. Brown asked how Murphy was doing and Murphy responded that he was okay. Murphy Dep. at 255. Murphy then informed Brown and Mooney, for the first time, that he had received new medication for his migraines. *Id.* at 255-56, 264. Murphy admits that he got "rather upset" during this meeting. *Id.* at 447. After witnessing Murphy's emotional behavior, Brown determined that Murphy was not ready to return to work. Brown Dep. at 102. Brown requested that Murphy obtain a doctor's release before returning to work. Murphy Dep. at 264-66. Two days after the meeting, Murphy applied for state unemployment benefits. *Id.* at 363.

The record is unclear, but at some time between the February 20 meeting and March 1, 1995, BPC requested copies of Murphy's medical records. *See id.* at 409, 410, 414-15. During this time period, Murphy taped a phone conversation between himself and Brown where Murphy stated that he could not provide BPC with his medical records. *Id.* at 268, Ex. 4 at 3. During that same conversation, the following exchange took place:

| | |
|---|---|
| Murphy: | Ya know, so, ya know, if, ya know, if I don't have a job anymore or whatever, ya know, I understand you have to do what's best for you. |
| Brown: | Yeah, that's true we have to protect ourselves too. |
| Murphy: | Yes sir, I understand. |
| Brown: | Okay. Well, all right Dennis, I hope you do better. |

| | |
|---|---|
| Murphy: | Yes, sir. Well, do I need to come pick my tools up? |
| Brown: | Well that's up to you, Dennis. If we can't get your medical records, get everything straightened out, I don't guess you need the tools. You know, that's just up to you. |
| Murphy: | Yes, sir. |
| Brown: | I don't know if they'll be here or not. You know as much about that as I do. |
| Murphy: | Well, everyone out in the shop is real trustworthy; I'm not worried about that. |

Murphy Dep. Ex. 4 at 4.

Murphy also contacted Dr. Mirelman's office after the February 20 meeting to request another work release. *Id.* at 260, 267-68.[6] An assistant of Dr. Mirelman subsequently contacted the company for verification of what information was needed. *See* Sheila Brown Aff. ¶ 3-4, Attach. A. Soon thereafter, Dr. Mirelman's assistant conveyed to Murphy that, based on her contact with BPC, BPC was not concerned with all of Murphy's medical records but only those pertaining to Murphy's use of antidepressants. Murphy Dep. Ex. 7 at 1. Sheila Brown asserts that BPC was only interested in whether Murphy posed a safety risk. Sheila Brown Aff. ¶ 4. Murphy then requested and received a "release" from Dr. Walter P. Pinson, which he hand-delivered to BPC on March 1, 1995. Murphy Dep. at 271-72, 283,

---

[6] Murphy is unclear as to when these events occurred, *see id.* at 409-10, but he believes that his first recorded conversation with Brown occurred on February 27, 1995. *Id.* at 363, Ex. 4. This date appears to be correct because Murphy's subsequent conversation with Dr. Mirelman's office was documented by that office as occurring on February 27, 1995. *See* Sheila Brown Aff. ¶¶ 3-4, Attach. A. During that conversation, Murphy states that he talked to Brown "this morning" about his inability to pay for medical records. Murphy Dep. Ex. 7 at 2.

367. The alleged "release" was a letter from Dr. Pinson stating that Murphy suffered from high blood pressure and from migraines. Pl.'s Evidentiary Submission Ex. 7. The letter also states which medications were prescribed for Murphy but makes no mention of Murphy's fitness for work. *Id.* While Murphy was delivering the release, Brown allegedly mentioned that Murphy had tested positive for marijuana during his pre-employment drug screen and requested copies of all of Murphy's medical records for the first time. Murphy Dep. at 283, 332-37.

On March 2, 1995, Murphy applied for employment at Superior Machine & Pattern, Inc. ("Superior"). *Id.* at 292-94, Ex. 8 (application for employment). Around March 2 or March 3, Murphy returned to BPC to pick up his tools and exchange "good-byes" with his co-workers. *Id.* at 389. According to Murphy, he also spoke to Mooney and explicitly stated that he had neither quit nor resigned but was simply not being permitted to return to work. *Id.* at 432-33. Mooney conveyed Murphy's statement to Brown. Mooney Dep. 115.

Murphy began working for Superior as a machinist on March 6, 1995. Murphy Dep. Ex. 19. He took the tools that he had used at BPC with him to work at Superior. *Id.* at 431. On March 23, 1995, Murphy telephoned Mooney to tell him that he had found another job. *Id.* at 388, 455-56. According to Mooney, Murphy also mentioned that he would not receive insurance coverage at Superior until he had been employed for ninety days. Mooney Dep. at 118. As reflected in a letter from BPC's insurance carrier, BPC maintained Murphy's insurance coverage until May 1, 1995, roughly ninety days after Murphy last worked at BPC. Sheila Brown Aff. ¶ 5, Attach. B. Murphy's employment with Superior terminated on April 18, 1995. Murphy Dep. Ex. 19.

Murphy recorded his April 19, 1995 conversation with Sheila Brown regarding his insurance status. *Id.* at 390-91, Ex. 5. According to the transcript of this conversation, Sheila Brown acknowledged that Murphy's insurance coverage was scheduled to lapse on May 1, 1995 and asserts that BPC was not obligated to carry Murphy on its plan because "[y]ou're no longer working here . . . ." *Id.* at Ex. 5 at 2. Murphy responded that, under COBRA, he had a right to continued coverage. *Id.* at Ex. 5 at 2-3. Although Murphy's coverage apparently lapsed on May 1, BPC eventually reinstated his coverage to comply with COBRA. *See* Sheila Brown Aff. ¶¶ 5-6, Attach. C (letter of May 19, 1995 from Sheila Brown to John Alden Life Insurance Company).

## II. SUMMARY JUDGMENT STANDARD

Under FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings and evidence indicate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine

issue for trial." *Anderson*, 477 U.S. at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III. DISCUSSION

### A. ADA Claim

In his Complaint, Murphy alleges that "his discharge may have been related to BPC's perception that Murphy had a disability because of his prior drug rehabilitation treatment." Pl.'s Compl. ¶ 9. The Americans with Disabilities Act ("ADA") prohibits employment "discriminat[ion] against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). The term "qualified individual with a disability" does "not include any employee or applicant who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of such use." 42 U.S.C. § 12114(a). The ADA does, however, protect individuals who have successfully completed a supervised drug rehabilitation program and are no longer using illegal drugs as well as individuals who are erroneously regarded as engaging in illicit drug use. 42 U.S.C. § 12114(b).[7] Because

---

[7] The ADA prohibition against discriminatory conduct covers medical examinations and inquiries. 42 U.S.C. § 12112(d). However, the ADA specifically excludes testing for illegal drug use from its definition of "medical examination" and takes a neutral position on the use of such drug tests. 42 U.S.C. 12114(d). Therefore, Murphy's allegations of discriminatory treatment due to actual or requested drug testing cannot support his ADA claim.

Murphy has failed to raise a genuine issue of material fact concerning his ADA claim, the court is of the opinion that BPC's Motion for Summary Judgment on this claim is due to be granted.

The legal standards that govern employment discrimination claims under other statutes, such as Title VII, are wholly applicable to disparate treatment claims under the ADA. *See Weigel v. Target Stores*, 122 F.3d 461, 465 (7th Cir. 1997); *Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1578-79 (N.D. Ala. 1996). The Supreme Court has established a tripartite framework that governs the basic allocation of burdens and order of presentation of proof in these cases. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973); *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-253. Under the *McDonnell Douglas/Burdine* framework, the plaintiff bears the initial burden of proving a prima facie case of discrimination. *Burdine*, 450 U.S. at 252-53. If the plaintiff successfully makes such a showing, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. *Id.* at 253-54. If the defendant succeeds in carrying this burden, then the plaintiff must prove that the defendant's articulated reasons are a mere pretext for discrimination. *Id.* at 253-56. At all times, the plaintiff bears the burden of persuasion on the ultimate question: whether the defendant has intentionally and unlawfully discriminated against the plaintiff. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

To establish a prima facie case of discrimination, a plaintiff may employ direct, statistical or circumstantial evidence. *Wilson v. AAA Plumbing Pottery Corp.*, 34 F.3d 1024, 1027 (11th Cir. 1994). A prima facie case simply requires evidence that is adequate to create

an inference of illegal discrimination. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 (1977). Murphy has presented neither statistical nor direct evidence of discrimination. Using circumstantial evidence, Murphy could establish a prima facie case of discriminatory discharge by showing: (1) he qualifies for protection under the ADA; (2) he was discharged; (3) he was qualified for his position at the time of discharge; and (4) a factfinder could reasonably conclude that the employer demonstrated an intent to discriminate in reaching that decision. *See Jameson v. The Arrow Co.*, 75 F.3d 1528, 1531 (11th Cir. 1996); *see also Weigel* 122 F.3d at 465 (ADA case).

The court will assume that Murphy could establish a prima facie case: (1) Based on Murphy's prior drug use and alleged rehabilitation, a factfinder could reasonably find that Murphy qualifies for ADA protection as an individual who has "successfully completed a supervised drug rehabilitation program and is no longer engaging in the illegal use of drugs." Alternatively, a factfinder could determine that Murphy is an individual who "is erroneously regarded as engaging in [drug] use, but is not engaging in such use." 42 U.S.C. § 12114(b). (2) A factfinder could reasonably determine that BPC had constructively discharged Murphy because BPC would not allow him to return to work unless he complied with BPC's request for medical records.[8] (3) The condition on Murphy's return to work indicates that BPC considered Murphy to be otherwise qualified for his machinist position and Brown admits that

---

[8] BPC asserts that Murphy had not been terminated but had quit his job when he returned to BPC during the first week of March 1995 to pick up his tools and exchange "good-byes" with co-workers. *See* Brown Dep. at 141-42; Mooney Dep. at 115; Sheila Brown Aff. ¶¶ 5, 7, Ex. D (correspondence from BPC stating that Murphy had quit). Because the court must draw all reasonable inferences in favor of the nonmoving party, Murphy, *see Anderson*, 477 U.S. at 255, the court will infer that Murphy was constructively discharged.

Murphy has the skills of a qualified machinist. *See* Brown Dep. at 52-53. Murphy's subsequent employment with Superior in a similar position also supports a reasonable inference that Murphy was qualified at the time of his discharge. (4) Several facts, including BPC's knowledge of Murphy's past drug use, Brown's alleged comment to Murphy on March 1, 1995 that Murphy had tested positive on his pre-employment drug screen, and BPC's request for Murphy's medical records, could arguably support an inference of discriminatory intent.

BPC has met its burden of producing evidence of a legitimate, nondiscriminatory reason for Murphy's discharge. BPC allegedly discharged Murphy because Murphy had refused to comply with BPC's requests for a medical release, medical records, and possible additional testing. Murphy Dep. 283-84, 341. BPC maintains that its requests were intended to elicit some medical assurance that Murphy could safely return to work. Brown Dep. at 127-131. Given the safety-sensitive nature of Murphy's machinist position[9] and Murphy's inability to effectively return to work following his bout with kidney stones, BPC's requests for medical assurance appear to be justified. Therefore, BPC has met its burden of producing a legitimate, nondiscriminatory reason for discharging Murphy.

Under the *McDonnell Douglas/Burdine* framework, Murphy bears the burden of proving that the proffered reason is merely a pretext for intentional discrimination. The Supreme Court instructs that "[i]t is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Hicks*, 509 U.S. at 519.

---

[9] Murphy has acknowledges the safety-sensitive nature of his machinist position. Murphy Dep. at 395-96.

The court's inquiry focuses on evidence challenging the veracity—not the wisdom—of the defendant's proffered rationale. The Eleventh Circuit has emphasized that an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, so long as its action is not a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (Title VII case).

In the present case, Murphy has failed to assert facts that would rebut the defendant's proffered reasons for its medical requests. First, Murphy has failed to present any evidence which could reasonably challenge the truthfulness of BPC's proffered reason. BPC's requests came after three failed attempts by Murphy to return to work and after Murphy informed BPC, for the first time, that he had been placed on two new medications, including an antidepressant. Murphy does not deny that these were the circumstances which existed at the time of BPC's request. He relies solely upon conclusory allegations that discriminatory intent, not genuine safety concerns, motivated BPC's requests for medical assurances.

Furthermore, Murphy fails to provide sufficient evidence of any discriminatory animus on the part of BPC. In fact, the evidence produced by both parties tends to suggest otherwise. It is undisputed that Murphy completed a drug rehabilitation program in 1985. Murphy Dep. at 36-39. However, BPC offered Murphy a machinist position *after* Murphy had informed BPC about his prior drug use and rehabilitation. *Id.* at 134-35, 144-45. Because Billy Brown was the same decision-maker responsible for both Murphy's hire and discharge, a strong inference of nondiscrimination arises which Murphy fails to rebut. *See EEOC v. Our Lady of Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir. 1996); *Evans v. Technologies Application & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996); *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d

461, 465 (6th Cir. 1995), *cert. denied*, __ U.S. __, 116 S.Ct 785 (1996); *Pound v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991). Murphy offers no explanation as to why BPC would first hire him with full knowledge of his drug use history and then discharge him for the same reason. [10]

Instead, Murphy argues that BPC's proffered reason is pretextual because BPC requested additional medical assurances after Murphy had already presented two medical releases, one from Dr. Mirelman and one from Dr. Pinson. However, these two releases do not support a reasonable finding of pretext. Murphy presented Dr. Mirelman's release when he first returned to work after his kidney stone procedure in January 1995. BPC initially accepted this release and allowed Murphy to return to work. It is undisputed that despite this release, Murphy was unable to effectively return to work. Given Murphy's condition and the fact that the release did not account for two new medications prescribed by another doctor, BPC could no longer rely upon Dr. Mirelman's release. Additionally, Dr. Pinson's letter cannot be viewed as a valid medical work release. The letter only describes Murphy's condition and medication. No mention is made of Murphy's ability to return safely to work or the effect of Murphy's medications on his ability to safely perform his job. In sum, Murphy

---

[10] Murphy advances several "facts" as evidence of BPC's discriminatory intent. Pl.'s Resp. at 27-29. The court finds that these facts, taken individually or as a whole, do not support a reasonable inference of discrimination. For example, following Murphy's migraine episode in June 1994, Dr. Sather wrote a "letter of recommendation" to BPC on Murphy's behalf. Sather Aff. ¶ 7. Murphy asserts that the "drug-free, reliable fellow" language of this letter supports an inference of discrimination, presumably because such language implies that Sather was addressing Brown's suspicions that Murphy was using drugs. *See* Pl.'s Resp. at 28 (quoting Pl.'s Evidentiary Submission Ex. 5). However, Dr. Sather himself has stated that "drug-free, reliable fellow" is customary language for these types of letters. Sather Aff. ¶ 7. Murphy has presented no evidence that suggests otherwise. Similarly, Murphy's other allegations also fail to adequately support a finding of discriminatory intent.

has not provided a sufficient evidentiary basis from which a reasonable jury could conclude that unlawful discrimination, not an employer's proffered rationale, was the true reason for an adverse employment decision.[11] Therefore, the defendant's Motion for Summary Judgment as to Murphy's ADA claim is due to be granted.

### B.  State Law Claims

In his Complaint, Murphy also asserts state law claims of outrage and invasion of privacy. Pl.'s Compl. ¶¶ 15-18. Although Murphy fails to address these claims in his opposition to the present Motion, it is unclear whether Murphy has conceded his state law claims. Accordingly, the court has considered these claims and determined that BPC's Motion for Summary Judgment is due to be granted as to these claims as well.

#### 1.  *Invastion of Privacy*

Under Alabama law, four distinct "wrongs" may constitute an actionable claim of invasion of privacy:

> "(1) the intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false but not necessarily defamatory position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a commercial use."

*Patterson v. Augat Wiring Sys., Inc.*, 944 F. Supp. 1509, 1522 (M.D. Ala. 1996) (quoting *Phillips v. Smalley Maintenance Serv., Inc.*, 435 So.2d 705, 708 (Ala. 1983)). Though unspecified in the present case, Murphy appears to be proceeding under the "intrusion upon seclusion" theory. Under this theory, invasion of privacy consists of "the wrongful intrusion

---

[11] Murphy even admits that he "was never given any indication" that his past drug use had anything to do with his discharge. *See* Murphy Dep. at 531-533.

into one's private activities in such a manner as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *McIsaac v. WZEW-FM Corp.*, 495 So.2d 649, 651 (Ala. 1986).

Murphy apparently claims that BPC's request for medical verification was a "wrongful intrusion into his private activities" which occurred in such a manner as to outrage or cause an ordinary person to suffer mental suffering, shame or humiliation." BPC counters that its medical inquiry was not a "wrongful intrusion" because its inquiry was prompted by business necessity arising out of genuine concern for Murphy's safety. Def.'s Mot. ¶ 5. Moreover, BPC contends that even if its request for medical information could be construed as a wrongful intrusion, it was not done in "such a manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities." The court finds that the evidence cannot reasonably support Murphy's invasion of privacy claim.

BPC's medical inquiry addressed legitimate business concerns and was, therefore, not "wrongful" under the law. In light of Murphy's inability to effectively return to work, this request was neither outrageous nor improper. Furthermore, BPC's request could not reasonably be construed as being communicated in a manner to outrage or cause mental suffering, shame or humiliation. Instead, the record reflects that Brown simply requested medical records from Murphy. Murphy even admits that BPC's request, as communicated by Brown, was neither accompanied by threats of termination nor communicated in a hostile manner. Murphy Dep. at 333-34. Instead, Brown made his requests in a polite tone with expressed concern for Murphy's medical condition. *Id.* at 334-35. The court concludes that BPC's requests would not cause mental suffering, shame or humiliation in a person of

- 17 -

ordinary sensibilities. *See Johnson v. Corporate Special Servs.*, 602 So.2d 385, 388 (Ala. 1992) (noting that justified intrusions may be actionable if accomplished through offensive or objectionable means); *Logan v. Sears, Roebuck & Co.*, 466 So.2d 121, 123 (Ala. 1985) (requiring "extreme or outrageous" instrusion that would "offend the sensibilities of an ordinary person similarly situated").

### 2. *Outrage*

Similarly, viewed in the light most favorable to Murphy, BPC's conduct does not reasonably support Murphy's claim of outrage. Under Alabama law, plaintiffs bear a heavy burden because the tort of outrage is actionable only "'in the most egregious circumstances.'" *Kilgore v. Thompson & Brock Management, Inc.*, 93 F.3d 752, 755 (11th Cir. 1996) (quoting *Thomas v. BSE Indus. Contractors, Inc.*, 624 So.2d 1041, 1044 (Ala. 1993)). To be actionable, the conduct must be "'so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.'" *Kilgore*, 93 F.3d at 755 (quoting *American Road Service Co., v. Inmon*, 394 So.2d 361, 365 (Ala. 1980)). In fact, Alabama courts have only recognized outrage claims in three narrow categories of cases: (1) where wrongful conduct is alleged in the context of family burials; (2) where insurance agents allegedly employed "heavy-handed, barbaric means" to coerce insurance claim settlements; and (3) where complaints concern "egregious sexual harassment." *Thomas*, 624 So.2d at 1044. The court finds that Murphy's allegations do not fall into any of these recognized categories. Moreover, Murphy fails to identify any conduct by BPC which could be properly characterized as "atrocious" and "utterly intolerable in a civilized society." Therefore, the court concludes that BPC's Motion for

Summary Judgment as to Murphy's outrage claim is due to be granted.

## IV. CONCLUSION

Based on the foregoing, Murphy has failed to raise a genuine issue of material fact with respect to his claims against BPC. Accordingly, the court is of the opinion that BPC's Motion for Summary Judgment is due to be granted. An order in accordance with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this 24th day of March, 1998.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge